UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHALOS & CO., P.C.                         CIVIL ACTION

VERSUS                                     NO: 14-2441

MARINE MANAGERS, LTD., ET AL.              SECTION: R(5)

## ORDER AND REASONS

Plaintiff Chalos & Co, P.C. moves for summary judgment on its breach of contract claim against defendants Marine Managers, Ltd. and Homeland Maritime, Ltd.[1]  Chalos also moves to strike portions of defendants' summary judgment evidence.[2]  For the following reasons, the Court grants the motion for summary judgment on the issue of liability, but finds that Chalos's motion lacks sufficient information for the Court to determine an appropriate damages award at this time.  The Court denies as moot Chalos's motion to strike defendants' summary judgment evidence.

---

[1]    R. Doc. 39.

[2]    R. Doc. 43.

# I.    BACKGROUND

## A.    Parties

Defendants Marine Managers, Ltd. and Homeland Maritime, Ltd. are foreign corporations organized and existing under the laws of the Marshall Islands, with their principal place of business in Greece.[3]  At all relevant times, Marine and Homeland managed and operated the M/V TRIDENT NAVIGATOR, a bulk cargo vessel that traveled between international ports.[4]

Matthaios Fafalios, whom the Court dismissed from this litigation on August 28, 2015, is a native of Greece.  Fafalios presently resides in Louisiana.[5]  On December 3, 2013, Marine and Homeland employed Fafalios as Chief Engineer of the M/V TRIDENT NAVIGATOR.[6]

Plaintiff Chalos & Co., P.C. is a law firm with offices in New York, Texas, and Florida, as well as offices in Greece.[7]  Following a United States criminal investigation into allegations that crewmembers aboard the M/V TRIDENT

---

[3]    R. Doc. 27 at  ¶¶ 2-3.

[4]    *See id.* at 1 ¶ 2.

[5]    R. Doc. 20 at 1 ¶ 2.

[6]    R. Doc. 15-1 at 1.

[7]    *See* R. Doc. 1 at 1.

NAVIGATOR illegally discharged oily waste into the ocean, Marine and Homeland hired Chalos as independent legal counsel for Fafalios.[8]

### B.    Procedural Background

On October 24, 2014, Chalos filed this breach of contract action against Marine and Homeland.[9]   Chalos argues that after signing a retainer agreement with the firm on Fafalios's behalf in February 2014, Marine and Homeland unilaterally declared the agreement null and void on June 17, 2014.[10]   Chalos continued to represent Fafalios during the Government's investigation and eventual criminal prosecution even though Marine and Homeland stopped paying the bills.[11]   Chalos now seeks to enforce the parties' retainer agreement and to recover the legal fees, costs, and expenses incurred in connection with Chalos's continued representation of Fafalios.[12]

On February 2, 2015, Marine and Homeland filed a third-party complaint against Fafalios alleging that he fraudulently induced them to enter

---

[8]     *See* R. Doc. 27 at 5 ¶¶ 14-15.

[9]     R. Doc. 1.

[10]    R. Doc. 27 at 5 ¶¶ 15-16.

[11]    *See id.* at 6 ¶ 17.

[12]    *Id.* at 7 ¶ 22.

3

the retainer agreement with Chalos.[13]  Fafalios moved to dismiss the third-party complaint based on the forum selection clause in his employment contract with Marine and Homeland, which required all disputes arising out of the employment contract to be litigated in Greece.[14]  The Court granted Fafalios's motion to dismiss on *forum non conveniens* grounds on August 28, 2015.[15]

### C.    Factual Background and Summary Judgment Record

On December 3, 2013, Marine and Homeland (defendants) hired Fafalios to serve as Chief Engineer for defendants' vessel, the M/V TRIDENT NAVIGATOR.[16]   In mid-January 2014, approximately one month into Fafalios's employment, the United States began investigating the M/V TRIDENT NAVIGATOR and its crew after the vessel voyaged from Saudi Arabia to New Orleans, Louisiana.  Based on a tip received from one or more of the vessel's crewmembers, the Government suspected that the M/V TRIDENT NAVIGATOR had illegally discharged "oily waste" in violation of the

---

[13]    R. Doc. 20.

[14]    *See* R. Doc. 24.

[15]    *See* R. Doc. 35.

[16]    R. Doc. 27 at 3 ¶ 9.

Act to Prevent Pollution from Ships, 33 U.S.C. § 1901, *et seq.*[17]  Allegedly, Fafalios instructed certain crewmembers to construct a "magic pipe"[18] to bypass the vessel's "Oily Water Separator" and to discharge bilge water and other oily waste directly into the ocean.  Fafalios then falsified handwritten entries in the M/V TRIDENT NAVIGATOR's "Oil Record Book" to conceal the illegal discharge.  Fafalios, along with the vessel's Second and Third Engineer, was responsible for maintaining the information in the Oil Record Book.[19] Fafalios also deleted photographic evidence of the crime after confiscating one of the Filipino crewmember's personal cell phone.[20]

There appears to have been much discord between the M/V TRIDENT NAVIGATOR's Greek crewmembers and Filipino crewmembers.  The Greeks allegedly believed certain Filipino crewmembers were the Government's whistleblowers.  The Greek crewmembers told defendants, companies based in Greece, and their attorney, who is also Greek, that the entire criminal

---

[17]     *Id.* at 3-4 ¶ 11.

[18]     A "magic pipe" is a plastic or rubber pipe or hose that is temporarily installed to the vessel's piping equipment to bypass the vessel's "Oily Water Separator" and discharge bilge water and oily waste directly into the sea.

[19]     R. Doc. 39-6 at 7 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 18:4 - 19:19, 124:23 - 125:14).

[20]     R. Doc. 40 at 2.

5

investigation amounted to false and malicious accusations by the Filipinos.  At his recent deposition, Fafalios testified that he believed the Filipino crewmembers gave perjured testimony at his criminal trial so the Government would prevail and the Filipinos could collect a whistleblower reward.[21] Defendants also emphasize that the M/V TRIDENT NAVIGATOR's Second and Third Engineers were both Greek citizens like Fafalios who supported Fafalios's version of events.[22]

On January 31, 2014, defendants executed an "Agreement on Security" with the United States Coast Guard.[23]  The Agreement provided that ten M/V TRIDENT NAVIGATOR crewmembers, including Fafalios, would remain within the jurisdiction of the Eastern District of Louisiana and that defendants would provide these crewmembers with, among other things, lodging and transportation to and from all government interviews, appearances, and other matters related to the Government's pending criminal investigation.[24]  Though

---

[21]    *See* R. Doc. 39-6 at 12 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 37:1 - 8); R. Doc. 40-4 at 5 (Defendants Exhibit C) (same).

[22]    *See* R. Doc. 40 at 3.

[23]    *See* R. Doc. 39-3 at 38 (Chalos Exhibit 9) (Agreement on Security); R. Doc 40-18 at 1 (Defendants Exhibit Q) (same).

[24]    *See* R. Doc. 39-3 at 42-43.

not expressly required by the Agreement on Security or the defendants' respective employment contracts with each crew member, defendants hired attorneys to represent the ten crewmembers during the course of the Government's investigation and any eventual criminal proceedings.[25] Defendants explain their motivation for hiring independent counsel as follows:

> [A]s a shipping company based in Greece, [defendants] felt a duty to support Fafalios, a Greek employee and seafarer whom [defendants] believed had served [them] dutifully and was innocent of any wrongdoing, in what was viewed as a malicious and baseless attack begun by one or more Filipino crewmen interested in personal gain. For similar reasons, [defendants] also appointed independent counsel for the other Greek officers whom the [Government] had placed under suspicion . . . .[26]

Originally, defendants hired an English-speaking attorney to represent Fafalios.[27]  Fafalios then requested a different lawyer–specifically, a Greek lawyer named George Gaitas, who worked for Chalos.[28]  At Fafalios's urging, defendants hired Chalos to be Fafalios's criminal defense counsel, and the

---

[25]     *See* R. Doc. 39-5 at 94-95 (Chalos Exhibit 18) (Deposition of Homeland Maritime Through Captain Marcos Papadopoulos, July 22, 2015, at 51:20 - 52:16); R. Doc. 40-14 at 5 (Defendants Exhibit M) (same).

[26]     R. Doc. 40 at 4.

[27]     R. Doc. 39-6 at 10 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 30:11 - 15); R. Doc. 40-4 at 4 (Defendants Exhibit C) (same).

[28]     R. Doc. 39-6 at 10, 12-13 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 30:16 - 18, 40:10 - 42:5).

parties confirmed Fafalios's legal representation in a retainer agreement executed in full on February 17, 2014.[29]

> Defendants' retainer agreement with Chalos provides in relevant part:
>
> The object of the legal representation is the current investigation by U.S. government authorities . . . and any eventual criminal prosecution that may cast Mr. Fafalios as a defendant. Mr. Fafalios has requested us to represent him in these matters and you have agreed, as his employer, to pay our legal fees, costs, and expenses in accordance with the following terms and conditions.
>
> We agree to represent Mr. Fafalios throughout the investigation and, after it is completed, in any criminal prosecution that may be pursued by the competent U.S. Government authorities. It should be understood that the attorney client relationship under this engagement will be between our law firm and Mr. Fafalios. Neither Marine Managers, Ltd. nor Homeland Maritime, Ltd. will be regarded [as] our clients.  Our duty to you will be to represent Mr. Fafalios to the best of our professional ability. You will not be responsible to Mr. Fafalios for the quality or the results of our representation. You will be responsible to us for the payment of our professional fees, costs and expenses under this agreement, but under no circumstances will this entitle you to give us any instructions on how to represent Mr. Fafalios. At all times we will be entitled to exercise independent judgment on behalf of our client, Mr. Fafalios, based on his instructions and considering solely his best interests.
>
> . . . .
>
> If at any time in the course of the representation you do not timely replenish our retainer deposit as provided in this letter we will be entitled to take all measures, including legal action, which are

---

[29]     R. Doc. 39-3 at 23 (Chalos Exhibit 5) (Engagement and Retainer Agreement).

appropriate in order to collect any fees, costs and expenses, incurred by us in representing Mr. Fafalios. Only Mr. Fafalios as our client will be entitled to terminate our appointment as his attorneys in this matter, but you will remain responsible for fees[,] costs and expenses incurred up to the time of the termination of our legal representation of Mr. Fafalios.

. . . .

This engagement letter, and retainer agreement, and all matters arising thereunder or in connection shall be governed by the laws of the State of Louisiana. This engagement letter and retainer agreement contains the entire agreement between us and may only be changed by a written amendment executed by both parties hereto.[30]

The retainer agreement does not condition the contract on Fafalios's factual innocence, nor does it mention defendants' belief in Fafalios's factual innocence. Nonetheless, defendants argue that they hired independent legal counsel for their Greek crewmembers because they believed, based on statements made by the Greek officers, including Fafalios, that the vessel's crew was innocent of intentional wrongdoing.[31] Defendants' attorney submitted an affidavit, which declares that "relying heavily" on Fafalios's assertions of innocence, he, on behalf of defendants, hired independent legal

---

[30] *Id.* at 23-25.

[31] R. Doc. 40 at 3-4.

9

counsel to represent the vessel's Greek officers.[32]   Likewise, two of the attorneys hired to represent the other Greek crewmembers submitted affidavits declaring that they "understood that [defendants] believed based on the initial statements that no illegal discharges had ever occurred from the Vessel . . . ."[33]   Further, these attorneys stated that, upon hiring them as independent legal counsel, defendants' attorney "expressed that [defendants'] reason for seeking independent counsel . . . was to ensure that employees who served [defendants] in good faith received [defendants'] support, and to facilitate the coordinated defense of any innocent parties . . . who might nonetheless be charged by the Government."[34]   On the other hand, Fafalios's counsel, George Gaitas, submitted a declaration in which he stated, "[a]t no time . . . was I advised by anyone or had [sic] any reason to believe that the

---

[32]     R. Doc. 40-7 at 2 (Defendants Exhibit F) (Affidavit of Daniel A. Tadros).

[33]     R. Doc. 40-9 at 2 (Defendants Exhibit H) (Affidavit of Brian J. Capitelli); R. Doc. 40-10 at 1-2 (Defendants Exhibit I) (Affidavit of Dorothy Manning Taylor).

[34]     R. Doc. 40-9 at 2 (Defendants Exhibit H) (Affidavit of Brian J. Capitelli); R. Doc. 40-10 at 2 (Defendants Exhibit I) (Affidavit of Dorothy Manning Taylor).

reason why [defendants] were agreeing to pay for the representation of Mr. Fafalios . . . was their belief that he was innocent . . . ."[35]

During the course of Chalos's representation of Fafalios, Fafalios's attorney and defendants' attorney exchanged numerous emails. Defendants contend that these emails not only reveal that Chalos knew or should have known that defendants originally believed Fafalios was innocent of intentional wrongdoing, but that Chalos also independently believed Fafalios was innocent. For example, Fafalios's attorney George Gaitas repeatedly referred to the Filipino crewmembers who reported the illegal discharge to the Government as "would-be whistleblowers,"[36] "false whistleblowers,"[37] and "self-proclaimed whistleblowers."[38] Gaitas also reported finding "objective evidence that contradicts the statements . . . suggesting that on that date a bypass was used[,]" and concluded "[s]o much for the allegations regarding December 31, 2013 . . . ."[39] On another occasion, Gaitas believed that certain

---

[35]    R. Doc. 39-2 at 5 (Declaration of George A. Gaitas in Support of Motion for Summary Judgment).

[36]    R. Doc. 40-11 at 3, 14 (Defendants Exhibit J).

[37]    *Id.* at 9, 13, 21, 41.

[38]    *Id.* at 17, 28, 33.

[39]    *Id.* at 9.

evidence "virtually debunk[ed] the government's version of the events, i.e. that there was pumping overboard of oily waste through a bypass. . . . Clearly the self-proclaimed whistle blowers are lying."[40]   When presented with video evidence that supported the Government's illegal discharge theory, Gaitas concluded, "[i]t follows that this video was staged and it just might be that the entire story of the false 'whistleblowers' is a fiction."[41]  Gaitas speculated that these whistleblowers concocted the illegal discharge story to collect a monetary reward.[42] Further, he wrote, "[m]y client contemplates a civil action . . . for the damages that these false representations have caused to him."[43] Again, Gaitas wrote, "[t]hese things are technically impossible. Bit by bit my impression is being reinforced that the false whistle-blowers have put together a story in order to collect a reward."[44]

---

[40]    *Id.* at 33.

[41]    *Id.* at 41.

[42]    *Id.* at 14.

[43]    *Id.*

[44]    *Id.* at 21.

On June 17, 2014, defendants notified Chalos that they considered the retainer agreement to be null and void and refused to continue to pay Fafalios's legal fees.[45]  Specifically, defendants wrote:

> [E]vents subsequent to the Company's execution of the Engagement Letter with your firm on February 17, 2014, have demonstrated that the Company's agreement to pay the costs and fees associated with Mr. Fafalios's defense was void *ab initio*.  The Company hereby provides notice that it will not pay for any costs or fees incurred in relation to Mr. Fafalios's defense beyond June 17, 2014. Please provide us with an invoice for services rendered through that date . . . .[46]

When pressed for further explanation, defendants elaborated:

> [Defendants] were under no obligation to pay [Fafalios's] legal expenses. Nonetheless, the Company undertook to voluntarily pay the legal expenses believing that both the Company and its employees, including Mr. Fafalios, were wrongfully accused of crimes by the US Government. Moreover, at that time the Company, on the basis of information it was receiving from Mr. Fafalios, believed that Mr. Fafalios had performed his duties as an officer. Mr. Fafalios assured the Company, and the Company believed at that time, that no wrongdoing had occurred and that facts and evidence would show that the present circumstances arose from what was, at worst, a record-keeping clerical type of mistake. All of these Company beliefs were induced by Mr. Fafalios'[s] own statements to the Company and the US

---

[45]     R. Doc. 39-3 at 36 (Chalos Exhibit 8) (June 17, 2014 letter from Chaffe McCall to Chalos & Co.); R. Doc. 40-12 at 1 (Defendants Exhibit K) (same).

[46]     R. Doc. 39-3 at 36 (Chalos Exhibit 8) (June 17, 2014 letter from Chaffe McCall to Chalos & Co.); R. Doc. 40-12 at 1 (Defendants Exhibit K) (same).

> Government, as well as by the statements of other Company employees acting on Mr. Fafalios's instructions. . . . Had the Company been aware at the time of it's [sic] entering the agreement to pay Mr. Fafalios'[s] legal expenses the extent and nature of his action as Chief Engineer of the Trident Navigator, it would not have volunteered to cover those expenses.[47]

Despite defendants' terminating their agreement to pay Fafalios's legal fees, Chalos continued to represent Fafalios, who proceeded to criminal trial and was found guilty of illegal discharge of oily waste into the ocean, obstruction of justice, and witness tampering on December 16, 2014.[48] Chalos incurred an additional $390,540.48 in legal fees and expenses associated with Fafalios's representation after June 17, 2014.[49]

Defendants argue that the retainer agreement with Chalos is null and that therefore they are not be liable for Fafalios's legal fees because defendants agreed to the contract in error.[50] Defendants' assert that unbeknownst to them at the time of entering the retainer agreement and contrary to defendants'

---

[47]     R. Doc. 39-3 at 61 (Chalos Exhibit 12) (June 18, 2014 email from Tadros to Gaitas).

[48]     *See* R. Doc. 39-1 at 5; R. Doc. 40-6 (Defendants Exhibit E) (Jury Verdict Form); *United States v. Fafalios*, No. 14-128, Section K (E.D. La. 2014).

[49]     *See* R. Doc. 39-4 at 45 (Chalos Exhibit 13) (Chalos Attorney Invoices).

[50]     R. Doc. 40 at 10.

strict policies, Fafalios, while Chief Engineer of the M/V TRIDENT NAVIGATOR, instructed certain crewmembers to illegally discharge oily waste into the ocean and to deny this ever occurred if questioned by the Government.[51] Also unknown to defendants, Fafalios falsified entries in the M/V TRIDENT NAVIGATOR's Oil Record Book to conceal his illegal actions.[52] Defendants assert that Fafalios misled defendants and their attorneys during the investigation because Fafalios persistently asserted his innocence while knowingly making false statements to defendants and others.[53] Defendants contend that they relied on Fafalios's repeated assurances of innocence to agree to pay for independent legal counsel to represent Fafalios in the Government's investigation and eventual criminal proceedings.[54]

According to defendants, only after they executed Chalos's retainer agreement did defendants learn about Fafalios's misrepresentations.[55]

---

[51]    *Id.* at 7-8.

[52]    *Id.* at 2.

[53]    *Id.* at 8.

[54]    R. Doc. 40-7 at 2 (Defendants Exhibit F) (Affidavit of Daniel A. Tadros).

[55]    *See* R. Doc. 39-3 at 36 (Chalos Exhibit 8) (June 17, 2014 letter from Chaffe McCall to Chalos & Co.); R. Doc. 40-12 at 1 (Defendants Exhibit K) (same).

Specifically, in March 2014, the Government disclosed to defendants that five witnesses would testify that Fafalios had ordered the illegal discharge. The Government also showed defendants two videos that supported the illegal discharge theory. First, a crewmember re-enacted "the exact method" by which the Greek officers had illegally discharged the vessel's oily waste. Second, the Government filmed part of their on-board investigation of the M/V TRIDENT NAVIGATOR. When the Government disassembled the vessel's overboard discharge valve—which should only contain clear water—dark liquid began spilling out, as if oil had passed through the discharge valve.[56] Finally, the vessel's Second and Third Engineers, Greek officers who had earlier fully supported Fafalios's story, recanted their original statements and admitted Fafalios had ordered the illegal discharge.[57]

On June 17, 2014, defendants notified Chalos that they considered the retainer agreement null and that they would not be responsible for any future legal fees incurred on Fafalios's behalf.[58] Defendants requested any

---

[56]     R. Doc. 40 at 7.

[57]     *Id.* at 7-8.

[58]     *See* R. Doc. 39-3 at 36 (Chalos Exhibit 8) (June 17, 2014 letter from Chaffe McCall to Chalos & Co.); R. Doc. 40-12 at 1 (Defendants Exhibit K) (same).

outstanding invoices through June 17,[59] and defendants paid for the legal fees and costs that Chalos had already incurred.[60]  Defendants paid a total of $44,428.09 for Fafalios's legal representation.[61]

Chalos now moves for summary judgment on its breach of contract claim.  Defendants oppose the motion.


## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir.

---

[59]    *See* R. Doc. 39-3 at 36 (Chalos Exhibit 8)  (June 17, 2014 letter from Chaffe McCall to Chalos & Co.); R. Doc. 40-12 at 1 (Defendants Exhibit K) (same).

[60]    R. Doc. 40-13 (Defendants Exhibit L) (Chalos & Co. invoices and July 7, 2014 letter from Chaffe McCall to Chalos & Co.)

[61]    *See* R. Doc. 40 at 9.

2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the movant will bear the burden of proof at trial, the movant "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.

*See id.* at 324.  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.  *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

In nonjury cases, such as this one,[62] where the judge is the ultimate finder of fact, the Fifth Circuit suggests that a "more lenient standard for summary judgment" is appropriate.  *U.S. Fid. & Guar. Co. v. Planters Bank & Trust Co.*, 77 F.3d 863, 865 (5th Cir. 1996).  Specifically, at the summary judgment stage of a bench trial, the judge may have "the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could not possibly lead to a different result."  *Id.* at 866.  That is, "if there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved."  *Id.*

---

[62]     *See* R. Doc. 9 at 3 (January 22, 2015 Scheduling Order noting that "[t]rial will commence . . . before the District Judge without a jury").

Thus, "if a trial on the merits will not enhance the court's ability to draw inferences and conclusions," then the court should draw those inferences "without resort to the expense of trial." *In re Placid Oil Co.*, 932 F. 2d 394, 398 (5th Cir. 1991).

## III.   DISCUSSION

### A.   Admissibility of Parole Evidence

Neither Chalos nor defendants dispute that Louisiana law applies to Chalos's breach of contract claim.[63]   Under Louisiana law, four elements are necessary to form a valid, enforceable contract: (1) capacity, (2) consent, (3) object, and (4) cause.  *See* La. Civ. Code arts. 1918, 1927, 1966, 1971; *see also McPherson v. Cingular Wireless, LLC*, 967 So. 2d 573, 577 (La. App. 3 Cir. 2007) (citing *Leger v. Tyson Foods, Inc.*, 670 So. 2d 397, 401 (La. App. 3 Cir. 1996)).   When a contract between the parties exists, parole evidence is generally inadmissable to vary the contract's terms.  *See* La. Civ. Code art. 1848 ("Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature."); *McCarroll v. McCarroll*, 701 So. 2d 1280, 1286 (La. 1997) (noting that parole evidence is

---

[63]      *See* R. Doc. 39-3 at 25 (Chalos Exhibit 5) (Engagement and Retainer Agreement)

inadmissable to vary the terms of an unambiguous contract).  Nevertheless, the Louisiana Civil Code provides that "in the interest of justice . . . evidence may be admitted to prove such circumstances as a vice of consent . . . ."  La. Civ. Code art. 1848; *see Davis v. Parker*, 145 F.3d 359, 1998 WL 307585, at *11 (5th Cir. May 12, 1998) ("Civil Code Article 1848 makes clear that testimonial evidence is properly admissible on questions of vice of consent.").

Here, to defend against enforcing the contract, defendants argue that their consent to the retainer agreement was vitiated by error.[64]  Therefore, under Louisiana Civil Code article 1848, the Court need not limit its evaluation of the evidence to the four corners of the parties' retainer agreement.  *See Davis*, 1998 WL 307585, at *11 (allowing parole evidence where party sought

---

[64]     R. Doc. 40 at 10.  Both parties seem to address "error" and "failure of cause" separately in their briefing to the Court, although, under the circumstances presented here, these theories are the same.  *See Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (equating "error" to a "failure of cause"); *Cryer v. M&M Mfg. Co.*, 273 So. 2d 818 (La. 1972) (same).  To avoid confusion, the Court will consistently refer only to "error" throughout this Order.

Defendants have also previously accused Fafalios of "fraudulently induc[ing] Defendants to undertake financial responsibility for his defense."  *See* R. Doc. 20 at 9-10 ¶ 26.  In opposition to Chalos's motion for summary judgment, defendants specifically note that they are unable to meet the requisite evidentiary burden to prevail on claim of fraud.  *See* R. Doc. 40 at 23-24.  Accordingly, defendants have abandoned any potential fraud defense.

21

rescission for error); *Peironnet v. Matador Res. Co.*, 144 So. 3d 791, 804-805 (La. 2013) (noting error as a common vice of consent).

## B. Whether Defendants' Consent Was Vitiated by Error

### 1. Louisiana Law Principles

A party's contractual consent "may be vitiated by error, fraud, or duress." La. Civ. Code art. 1948.  If error vitiates a party's consent, the contract may be rescinded.  *Cyprien v. Bd. of Supervisors ex rel. Univ. of La.*, 5 So. 3d 862, 868 (La. 2009).  But "[e]rror vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949.  Error may concern a cause without which the obligation would not have been incurred when:

> it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation.

La. Civ. Code art. 1950.  According to Official Revision Comment (e) of Civil Code article 1949, when a party may have had multiple causes for entering into an obligation, "error that bears on any one of them is sufficient to make the

obligation invalid."[65]  La. Civ. Code art. 1949, cmt. (e).  Under the Louisiana

Civil Code, "cause" is simply, "the reason why a party obligates himself."  La.

Civ. Code art. 1967; *see also Peironnet*, 144 So. 3d at 807  (citations omitted)

(defining cause as "the reason [a party] consented to bind himself").

A party's cause must be objectively determined.  Though the Civil Code

does not require cause to be explicitly addressed in the parties' contract, *see*

La. Civ. Code art. 1969 ("Cause not expressed"), a party claiming that it

maintained a certain cause for entering into a contractual obligation bears the

burden of proving that cause existed.  *See, e.g.*, *Peironnet*, 144 So. 3d at 805

(relying on "objective evidence" to determine plaintiffs' cause); *Coffee Bay*

*Inv'rs, LLC v. W.O.G.C. Co.*, 878 So. 2d 665, 671 (La. App. 1. Cir. 2004)

(looking beyond the parties agreement to determine cause based on objective

statements); *Lake Charles Auto Salvage, Inc. v. Stine*, 539 So. 2d 836, 837-38

(La. App. 3 Cir. 1989) (looking to verbal statements made before and at the

---

[65]      The Court recognizes that the Revision Comments to the
Louisiana Civil Code are not law.  Nonetheless, these comments are
instructive, as "they were presented together with the proposed legislation
and illuminate the understanding and intent of the legislators."  *Wartell v.*
*Women's & Children's Hosp., Inc.*, 704 So. 2d 778, 783 (La. 1997).  Both
federal and state courts often look to the Revision Comments for guidance.
*See, e.g.*, *McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 543 (5th Cir. 2012);
*Willis-Knighton Med. Ctr. v. Caddo Shreveport Sales & Use Tax Comm'n*,
903 So. 2d 1071, 1086 (La. 2005).

23

time of sale to determine defendants' cause); *Shreveport Great Empire Broad., Inc. v. Chicoine*, 528 So. 2d 633, 636-37 (La. App. 2 Cir. 1988) (holding that defendant failed to prove his stated cause for entering into the contract).  Accordingly, a party asserting error as a defense to enforcement of a contract must prove (1) an objective cause, or reason, why it entered into the contract; and (2) an error as to that cause, which may entitle the party to rescission or reformation of the contract.

Once a party proves error, however, rescission or reformation of the contract is not automatic.  Louisiana law distinguishes "excusable error," which would entitle the party-in-error to its requested remedy, from "inexcusable error," which would not.  *See* La. Civ. Code art. 1952, cmt. (d) ("In determining whether to grant rescission . . . the court may consider whether the error was excusable or inexcusable, a distinction received by modern civil doctrine. Louisiana courts have granted relief when error has been found excusable . . . and refused it when error has been found inexcusable[.]" (citations omitted)); *Shelton v. Congress St. Props., Inc.*, No. 92-1084, 1993 WL 43637, at *3 (E.D. La. Feb. 16, 1993) (noting that although facts may "technically satisfy" the codal language, courts must look to the nature of error before invalidating a contract).  Louisiana courts often define "inexcusable error" as an error that "the complaining party, through education or

24

experience, had the knowledge or expertise to easily rectify or discover . . . ." *Franklin v. Camterra Res. Partners, Inc.*, 123 So. 3d 184, 190 (La. App. 2 Cir. 2013) (collecting cases). In other words, one party's error will not invalidate the contract if the reason for the error was "the complaining party's inexcusable neglect in discovering the error." *Midwest Tower Partners LLC v. Guar. Broad. Co. of Baton Rouge, LLC*, 285 F. App'x 115, 2008 WL 2660779, at *3 (5th Cir. 2008) (citation omitted); *see also Peironnet*, 144 So. 3d at 811 (defining inexcusable error as one that results from "ignorance, neglect, or want of care").

### 2.   Analysis

Here, defendants argue that the retainer agreement must be rescinded because their consent to the contract was vitiated by error. According to defendants, the cause for their agreeing to hire counsel on Fafalios's behalf was their belief that Fafalios was innocent of any intentional wrongdoing. Defendants now explain that their cause was as follows:

> [A]s a shipping company based in Greece, [defendants] felt a duty to support Fafalios, a Greek employee and seafarer whom [defendants] believed had served [them] dutifully and was innocent of any wrongdoing, in what was viewed as a malicious and baseless attack begun by one or more Filipino crewmen interested in personal gain.[66]

---

[66]   R. Doc. 40 at 3.

Defendants argue that Chalos knew or should have known Fafalios's innocence was their cause for hiring independent legal counsel for two reasons. First, defendants' attorney represents that he specifically told George Gaitas that "because [the Greek officers] appear[] to be innocent victims, [defendants] intended to stand behind the Greek officers to defend them against any allegations brought by the U.S. Government."[67] Second, defendants point to evidence that they told every lawyer that they hired on the crewmembers' behalf that they believed these Greek officers to be innocent of wrongdoing.[68] Defendants contend that only after executing the retainer agreement did they discover that their belief was in error, which they argue vitiated their consent to the contract.

On the other hand, George Gaitas asserts that no one told him, nor did he or any other Chalos attorney have reason to believe, that defendants were agreeing to pay for Fafalios's representation because they believed he was factually innocent.[69] In support, Chalos points to the language of the retainer

---

[67]   R. Doc. 40-7 at 3 (Defendants Exhibit F) (Affidavit of Daniel A. Tadros).

[68]   *Id.* at 2; R. Doc. 40-9 at 2 (Defendants Exhibit H) (Affidavit of Brian J. Capitelli); R. Doc. 40-10 at 1-2  (Defendants Exhibit I) (Affidavit of Dorothy Manning Taylor).

[69]   R. Doc. 39-2 at 5 (Declaration of George A. Gaitas in Support of Motion for Summary Judgment).

agreement itself, which expressly provides that "[t]he objective of the legal representation is the current investigation by U.S. government authorities . . . and any eventual criminal prosecution that may cast Mr. Fafalios as a defendant."[70] This conflicting evidence creates an issue of fact on the question of cause that the Court cannot resolve on a motion for summary judgment. *See U.S. Fid. & Guar. Co. v. Planters Bank & Trust Co.*, 77 F.3d 863, 865 (5th Cir. 1996) (allowing a court to draw factual inferences on a motion for summary judgment in a non-jury case "if there are no issues of witness credibility").

Nonetheless, even if defendants' cause was their belief in Fafalios's innocence, and Chalos knew or should have known of that, this finding would only "technically satisfy" the codal language. The Court must still evaluate the nature of defendants' error as excusable or inexcusable. *See Shelton*, 1993 WL 43637, at *3. The Court finds that defendants' purported error is inexcusable.

The evidence shows a number of objective facts pointing to the conclusion that defendants had sufficient sophistication, knowledge, access to information, and expertise to rectify or discover the error. *See Franklin*, 123 So. 3d at 190 (finding error inexcusable when the complaining party had "the

---

[70]     R. Doc. 39-3 at 23 (Chalos Exhibit 5) (Engagement and Retainer Agreement).

knowledge or expertise to easily rectify or discover" the information underlying the error).  At the time defendants entered into Chalos's retainer agreement, they knew that the Government was criminally investigating whether the M/V TRIDENT NAVIGATOR's crewmembers had illegally discharged oily waste from the vessel.[71]  In fact, by January 30, 2014, the Government conducted an onboard investigation of the vessel, asserted to defendants that the violation had in fact occurred, and required that defendants keep certain crewmembers, including Fafalios, within the district for questioning.[72] Defendants also knew that the Government's investigation was based on tips received from one or more whistleblowers among the vessel's crew.[73]  Defendants also knew that the Government's whistleblowers reported that they participated in constructing the "magic pipe" used to

---

[71]    R. Doc. 39-3 at 39, 42-43, 45 (Chalos Exhibit 9) (Agreement on Security); R. Doc. 40-18 (Defendants Exhibit Q) (same).

[72]    *See* R. Doc. 40 at 2-3 (noting the Government's investigation began on January 17, 2014); R. Doc. 39-3 at 39 (Chalos Exhibit 9) (Agreement on Security); R. Doc. 39-6 at 6 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 14:8 - 15-5, 38:16 - 39:19).

[73]    R. Doc. 40 at 2; R. Doc. 39-3 at 2 (Chalos Exhibit 1) (February 10, 2014 email from Gaitas to Tadros explaining that "one or more of the would-be-whistle-blowers contends that he was a participant in the cobbling together of this [magic pipe]").

discharge oily waste.[74]  In addition, defendants knew that crewmembers accused of ordering the illegal discharge were the vessel's most authoritative officers, including Fafalios, who oversaw engineering activity aboard the vessel.[75]   Finally, defendants also knew that a crewmember allegedly photographed the magic pipe with his cell phone and attempted to report the illegal activity and that Fafalios confiscated the crewmember's phone.[76]

At the time defendants entered into Chalos's retainer agreement, defendants had access to both the vessel and its crewmembers and thus could have conducted a more thorough investigation into the Government's criminal allegations.  For example, the Government's testing of the magic pipe revealed at least that "at some point in time some type of oil substance passed through the hose . . . ."[77]  In addition, the Government easily discovered "dark liquid spilling out of the Vessel's overboard discharge valve[,]" which should have

---

[74]     *Id.*

[75]     *See* R. Doc. 40 at 3-4 (noting that they believed the Filipinos wrongly accused Fafalios, the Chief Engineer, and the Second and Third Engineers).

[76]     *See* R. Doc. 40 at 2; R. Doc. 39-5 at 41 (Chalos Exhibit 17) (April 7, 2014 email from Nelson to Tadros); R. Doc. 39-6 at 32 (Chalos Exhibit 19) (Deposition of Matthaios Fafalios, July 29, 2015, at 120:12-23).

[77]     *See* R. Doc. 40-11 at 22 (Defendants Exhibit J).

contained only clear liquid.[78]   Defendants have not suggested that this information was within the limited purview of the Government.   Indeed, defendants purportedly conducted their own investigation aboard the M/V TRIDENT NAVIGATOR, but have not pointed to any objective physical evidence that corroborated Fafalios's or the other Greek officers' proclamations of innocence.[79]   Instead, defendants emphasize that they "rel[ied] heavily" on Fafalios's self-interested representations of his own innocence.[80]

Importantly, defendants understood at the time of contracting that they were agreeing to pay for Fafalios's legal representation in the Government's *criminal* investigation and "any eventual *criminal* prosecution that may cast Mr. Fafalios as a defendant."[81]   The parties had to understand that there was a possibility that Fafalios could be found guilty of the crimes charged in the

---

[78]      *See* R. Doc. 40 at 7.

[79]      *See* R. Doc. 40-7 at 2 (Defendants Exhibit F) (Affidavit of Daniel A. Tadros).

[80]      *See id.* at 2.

[81]      *See* R. Doc. 39-3 at 23 (Chalos Exhibit 5) (Engagement and Retainer Agreement) (emphasis added).   The retainer agreement also says a second time that Chalos would represent Fafalios "throughout the investigation and, after it is completed, in any criminal prosecution that may be pursued by the competent U.S. Government authorities."   *Id.*

30

face of evidence that they knew the Government had, even if it was disputed. That defendants originally believed the Government's investigation would amount to nothing more than a "clerical type of mistake" is no excuse.[82] *See St. Charles Ventures, LLC v. Albertsons, Inc.*, 265 F. Supp. 2d 682, 694-95 (holding that defendant's belief that a remote possibility would not materialize is not an error for which a contract may be rescinded); *Shelton*, 1993 WL 43637, at *3 ("[A] claim of error cannot be based on the fact that a party would never have entered into a contract had it anticipated a future event.").

Defendants emphasize the support Fafalios originally received from other Greek officers and that the accusations originated from Filipino crewmembers.[83] Indeed, defendants' Chief Executive Officer testified that, upon learning Fafalios had confiscated a crewmember's cell phone because it contained pictures of illegal activity, defendants chose to believe "the Greek officers," rather than a non-Greek crewmember.[84] Based on the record, defendants did not have a reasonable basis to accept at face-value these Greek

---

[82]     *See id.* at 61 (Chalos Exhibit 12) (June 18, 2014 email from Tadros to Gaitas).

[83]     R. Doc. 40 at 3.

[84]     R. Doc. 39-5 at 86 (Chalos Exhibit 18) (Deposition of Homeland Maritime Through Captain Marcos Papadopoulos, July 22, 2015, at 43:4 - 24).

31

officers' allegations that lower-level Filipino crewmembers fabricated an elaborate scheme involving the construction of a "magic pipe" used for illegal dumping in order to collect a whistleblower's reward.  Defendants had an obvious self-interest in seeing the Greek officers exonerated, as acceptance of their story would have absolved defendants of criminal liability.  Regardless of whether this self-interest clouded their judgment, the objective evidence should have caused defendants to conduct further investigation.  Poor judgment does not excuse defendants' contractual obligations.  Therefore, defendants' purported error will not invalidate the retainer agreement.

### C.   Damages

Having determined that the parties' retainer agreement is enforceable, the Court now turns to the issue of damages.  Chalos seeks to recover $390,366.80, the entire amount of attorneys' fees and expenses incurred after June 17, 2014, when defendants stopped paying Chalos's invoices.[85]   In support, Chalos submits attorney invoices from the firm beginning August 7, 2014, through April 13, 2015.   The Court finds, however, that Chalos has failed to address the legal standard applicable to an award of attorneys' fees.

---

[85]     *See* R. Doc. 39-1 at 5.

32

The Court also notes that defendants question the reasonableness of Chalos's adding partner George Chalos to work on Fafalios's case. The Court therefore will not award attorneys' fees and costs at this time. The Court will allow Chalos fourteen days from entry of this Order to file a new motion for damages addressing the appropriate legal standard and whether its fee request satisfies it.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART plaintiff's Motion for Summary Judgment. IT IS ORDERED that plaintiff shall file within fourteen (14) days from entry of this Order a motion for damages with appropriate support. The Court DENIES AS MOOT plaintiff's Motion to Strike Defendants' Summary Judgment Evidence.

New Orleans, Louisiana, this __23rd___ day of October, 2015.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE